## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **THORNE RESEARCH, INC.** )<br><br>**Plaintiff,** )<br> )<br>v. )<br> )<br>**VARIAZIONI HOME, LLC,** )<br>**INVENTORY PARTNERS, LLC,** )<br>**VASESOURCE PURCHASING LLC,** )<br>**JOSHUA LAVI A/K/A JOSHUA** )<br>**HEDVAT, MORAD SHEMA, RYAN** )<br>**SHEMA, VASESOURCE INC.,** )<br>**VASESOURCE SALES, LLC, RONNIE** )<br>**GOODMAN, YITZHAK YAKOBI** )<br>**A/K/A ITZIK YAKOBI, and JOHN** )<br>**DOES 1-100,** )<br> )<br>**Defendants.** ) | **Case No. 2:23-cv-5613-BHH**<br><br>**COMPLAINT FOR DAMAGES,**<br>**INJUNCTIVE, AND OTHER RELIEF**<br>**FOR VIOLATION OF 15 U.S.C. § 1114;**<br>**15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c);**<br>**AND RELATED CLAIMS**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Thorne Research, Inc. ("Thorne") brings this action against Defendants Variazioni Home, LLC ("Variazioni"), Inventory Partners, LLC ("Inventory Partners"), Vasesource Purchasing LLC ("Vasesource Purchasing"), Joshua Lavi a/k/a Joshua Hedvat ("Lavi"), Morad Shema ("Morad"), Ryan Shema ("Shema"), Vasesource, Inc. ("Vasesource"), Vasesource Sales, LLC ("Vasesource Sales"), Ronnie Goodman ("Goodman"), Yitzhak Yakobi a/k/a Itzik Yakobi ("Yakobi"), and John Does (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement; (4) unfair and deceptive trade practices in violation of S.C. Code § 39-5-10 *et seq*.; (5) tortious interference with contract and business relations; and (6) breach of contract; and alleges as follows. Thorne's claims arise from Defendants' unlawful sale of infringing products bearing Thorne's trademarks.

## PARTIES

1.      Plaintiff Thorne Research, Inc. is a South Carolina corporation with its principal place of business in Summerville, South Carolina.

2.      Defendant Variazioni Home, LLC is a limited liability company organized under the laws of the State of New York.  According to corporate documents filed with the New York Secretary of State, the principal place of business of Variazioni is located at 14 Pinewood Rd., Roslyn, New York, 11576 (the "Pinewood Road Address").  Variazioni operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "BH Prime" with   Merchant ID AS3PH96JPNM1O (the "BH Prime Storefront" or "Amazon Storefront").      The    BH    Prime    Storefront    can    be    accessed    online    at https://www.amazon.com/s?me=AS3PH96JPNM1O.[1]  Variazioni does business throughout the United States through the Amazon Storefront, including in South Carolina.

3.      Joshua Lavi a/k/a Joshua Hedvat is a natural person who, upon information and belief, resides at the Pinewood Road Address.  Lavi operates or assists in the operation of the Amazon Storefront and does business throughout the United States – including in South Carolina – through the Amazon Storefront.

4.      The New York Secretary of State website and corporate documents that have been filed for Variazioni identify Lavi as the registered agent and the sole manager or member of

---

[1] As of the time of filing, Defendants' Amazon Storefront is named "BH Prime."  Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is identified in Paragraph 2 of this Complaint.  Even if Defendants change the name of their Amazon Storefront at some time in the future, their Storefront can always be accessed at the link in Paragraph 2 that contains the Merchant ID number.

Variazioni. Accordingly, upon information and belief, Lavi is in control of, a principle of, and primarily responsible for the actions of Variazioni.

5.    Thorne asserts claims against Lavi in his individual capacity and also in his capacity as a corporate officer of Variazioni. Upon information and belief, Lavi, in his individual capacity, and Variazioni both assist in and are responsible for the operation of the Amazon Storefront.

6.    Alternatively, as the sole manager and member of Variazioni, Lavi directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Thorne's trademarks by Variazioni. Accordingly, Lavi is personally liable for infringing activities carried out by Variazioni without regard to piercing the corporate veil.

7.    Alternatively, upon information and belief, Variazioni follows so few corporate formalities and is so dominated by Lavi that it is merely an alter ego of Lavi. Accordingly, Thorne is entitled to pierce the corporate veil of Variazioni and hold Lavi personally liable for the infringing activities of Variazioni.

8.    The Amazon Storefront publicly displays its "Business Name" as "INVENTORY PARTNERS LLC" and its "Business Address" as "10 Roberts Ln, Cedarhurst, NY, 11516" (the "Roberts Lane Address").

9.    Inventory Partners, LLC is a limited liability company organized under the laws of the State of New York. Upon information and belief, the principal place of business of Inventory Partners is located in Cedarhurst, New York. Inventory Partners operates or assists in the operation of the BH Prime Storefront. Inventory Partners does business throughout the United States through the Amazon Storefront, including in South Carolina.

10.    Morad Shema is a natural person who, upon information and belief, resides at the Roberts Lane Address. Morad operates or assists in the operation of the Amazon Storefront and

does business throughout the United States – including in South Carolina – through the Amazon Storefront.

11.     Information that Amazon.com, Inc. provided to Thorne in response to a subpoena identified Morad as the operator of the "BH Prime" storefront.  Accordingly, upon information and belief, Morad is in control of, a principle of, and primarily responsible for the actions of Inventory Partners.

12.     Thorne asserts claims against Morad in his individual capacity and also in his capacity as a corporate officer of Inventory Partners.  Upon information and belief, Morad, in his individual capacity, and Inventory Partners both assist in and are responsible for the operation of the Amazon Storefront.

13.     Alternatively, upon information and belief, Morad directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Thorne's trademarks by Inventory Partners.  Accordingly, Morad is personally liable for infringing activities carried out by Inventory Partners without regard to piercing the corporate veil.

14.     Alternatively, upon information and belief, Inventory Partners follows so few corporate formalities and is so dominated by Morad that it is merely an alter ego of Morad. Accordingly, Thorne is entitled to pierce the corporate veil of Inventory Partners and hold Morad personally liable for the infringing activities of Inventory Partners.

15.     Vasesource Purchasing LLC is a limited liability company organized under the laws of the State of New York.  According to corporate documents filed with the New York Secretary of State, the principal place of business of Vasesource Purchasing is located at 217 National Blvd., Long Beach, NY 11561.  Vasesource Purchasing operates or assists in the operation of the BH

Prime Storefront.  Vasesource Purchasing does business throughout the United States through the Amazon Storefront, including in South Carolina.

16.    Ryan Shema is a natural person who, upon information and belief, resides at the Roberts Lane Address.  Ryan operates or assists in the operation of the Amazon Storefront and does business throughout the United States – including in South Carolina – through the Amazon Storefront.

17.    The New York Secretary of State website and corporate documents that have been filed for Vasesource Purchasing identify Ryan as the registered agent of Vasesource Purchasing and identify no other manager or member of Vasesource Purchasing.  Accordingly, upon information and belief, Ryan is in control of, a principle of, and primarily responsible for the actions of Vasesource Purchasing.

18.    Thorne asserts claims against Ryan in his individual capacity and also in his capacity as a corporate officer of Vasesource Purchasing.  Upon information and belief, Ryan, in his individual capacity, and Vasesource Purchasing both assist in and are responsible for the operation of the Amazon Storefront.

19.    Alternatively, Ryan directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Thorne's trademarks by Vasesource Purchasing.  Accordingly, Ryan is personally liable for infringing activities carried out by Vasesource Purchasing without regard to piercing the corporate veil.

20.    Alternatively, upon information and belief, Vasesource Purchasing follows so few corporate formalities and is so dominated by Ryan that it is merely an alter ego of Ryan.  Accordingly, Thorne is entitled to pierce the corporate veil of Vasesource Purchasing and hold Ryan personally liable for the infringing activities of Vasesource Purchasing.

21. Vasesource Inc. is a corporation organized under the laws of the State of New York. Upon information and belief and according to corporate records, the principal place of business of Vasesource Inc. is located at 21 Dwight Place, Fairfield, New Jersey, 07004 (the "Dwight Place Address"). Vasesource operates or assists in the operation of the BH Prime Storefront. Vasesource does business throughout the United States through the Amazon Storefront, including in South Carolina.

22. Vasesource Sales, LLC is a limited liability company organized under the laws of the State of New York. Upon information and belief and according to corporate records, the principal place of business of Vasesource Sales is located at 141 W. 28th Street, New York, New York, 10001 (the "W. 28th Address"). Vasesource Sales operates or assists in the operation of the BH Prime Storefront. Vasesource Sales does business throughout the United States through the Amazon Storefront, including in South Carolina.

23. Yitzhak Yakobi a/k/a Itzik Yakobi is a natural person who, upon information and belief, resides at 71 Woods Drive, Roslyn, New York 11576. Yakobi operates or assists in the operation of the Amazon Storefront and does business throughout the United States – including in South Carolina – through the Amazon Storefront.

24. The New York Secretary of State website and corporate documents that have been filed for Vasesource Inc. identify Yakobi as the registered agent and chief executive officer and identify no other manager or member. Accordingly, upon information and belief, Yakobi is in control of, a principle of, and primarily responsible for the actions of Vasesource and Vasesource Sales.

25. Thorne asserts claims against Yakobi in his individual capacity and also in his capacity as a corporate officer of Vasesource and Vasesource Sales. Upon information and belief,

Yakobi, in his individual capacity, Vasesource, and Vaseource Sales all assist in and are responsible for the operation of the Amazon Storefront.

26.    Alternatively, Yakobi directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Thorne's trademarks by Vasesource and Vasesource Sales. Accordingly, Yakobi is personally liable for infringing activities carried out by Vasesource and Vasesource Sales without regard to piercing the corporate veil.

27.    Alternatively, upon information and belief, Vasesource and Vasesource Sales follow so few corporate formalities and are so dominated by Yakobi that they are merely an alter ego of Yakobi. Accordingly, Thorne is entitled to pierce the corporate veil of Vasesource and Vasesource Sales and hold Yakobi personally liable for the infringing activities of Vasesource and Vasesource Sales.

28.    Ronnie Goodman is a natural person who, upon information and belief, resides in New York, New York. Goodman operates or assists in the operation of the Amazon Storefront and does business throughout the United States – including in South Carolina – through the Amazon Storefront.

29.    Defendants are acting in concert as part of a coordinated scheme to sell products bearing Thorne's trademarks without authorization through multiple storefronts, marketplaces, and websites. Defendants are acting in concert and are jointly responsible for the conduct complained of herein.

30.    The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of the John Doe Defendants are unknown to Thorne. Therefore, Thorne sues these Defendants by a fictitious name. Thorne is informed and believes that the John Doe Defendants sued herein are equally responsible for the events and occurrences referred to herein.

For example, John Doe Defendants may have supplied infringing products bearing the Thorne Trademarks to the named Defendants or assisted the operation of the BH Prime Storefront. When the true names, involvement, and capacities of the John Doe Defendants are ascertained, Thorne will seek leave to amend this Complaint accordingly.

## JURISDICTION AND VENUE

31.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 for Thorne's claims that arise under federal law and 28 U.S.C. § 1367 for Thorne's claims that arise under state law because they form part of the same case or controversy as Thorne's claims that arise under federal law.

32.    This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of South Carolina and established sufficient minimum contacts with South Carolina by, among other things, advertising and selling substantial quantities of infringing products bearing Thorne's trademarks to consumers within South Carolina through a highly interactive commercial website, with knowledge that Thorne is located in South Carolina and is harmed in South Carolina as a result of Defendants' sales of infringing products to South Carolina residents. Defendants know that Thorne is located in South Carolina, among other reasons, because they received cease-and-desist letters informing them that Thorne is located in South Carolina and is harmed in South Carolina by their unlawful actions. Thorne's claims arise out of Defendants' substantial and regular sales of infringing products bearing Thorne's trademarks to South Carolina residents.

33.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Thorne and Its Trademarks

34.    Thorne is a health and technology company focused on combining dietary and lifestyle recommendations with nutritional supplement intervention.  Thorne is one of the industry's leading manufacturers of dietary supplements and at-home biomarker tests.

35.    Thorne allows products sold under the Thorne brand (referenced hereinafter as "Thorne products") to be sold to end-user consumers in the United States only by sellers who Thorne has expressly authorized to sell Thorne products ("Authorized Resellers").

36.    Thorne devotes a significant amount of time, energy, and resources toward protecting the value of the Thorne brand, products, name, and reputation.  By distributing Thorne products exclusively through its Authorized Resellers, Thorne is able to ensure the safety, well-being, and satisfaction of consumers, and maintain the integrity and reputation of the Thorne brand. In the highly competitive supplement market, quality and customer service are fundamental parts of the consumer's decision to purchase a product.

37.    Thorne allows Authorized Resellers to sell Thorne products only in approved channels and requires Authorized Resellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Thorne Rules").

38.    To promote and protect the Thorne brand, Thorne has registered several trademarks with the United States Patent and Trademark Office ("USPTO"), including but not limited to: THORNE® (U.S. Trademark Reg. No. 5,257,935), MEDICLEAR® (U.S. Trademark Reg. No. 2,525,208), RESVERACEL® (U.S. Trademark Reg. No. 5,218,436), FLORASPORT 20B® (U.S. Trademark Reg. No. 5,277,254), RECOVERYPRO® (U.S. Trademark Reg. No. 5,638,002), ENTEROMEND® (U.S. Trademark Reg. No. 4,837,342), NIACEL® (U.S. Trademark Reg. No.

4,796,156), 3-K COMPLETE® (U.S. Trademark Reg. No. 5,551714), VEGANPRO COMPLEX® (U.S. Trademark Reg. No. 4,615,259), CATALYTE® (U.S. Trademark Reg. No. 4,392,385), FIBERMEND® (U.S. Trademark Reg. No. 4,410,287), MEDIBOLIC® (U.S. Trademark Reg. No. 4,355,773), and METHYL-GUARD® (U.S. Trademark Reg. No. 2,178,525) (collectively, the "Thorne Trademarks").

39.     The registration for each of the Thorne Trademarks is valid, subsisting, and in full force and effect.  Further, pursuant to 15 U.S.C. § 1065, the Thorne Trademarks serve as conclusive evidence of Thorne's ownership of the marks and its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of the Thorne products identified in the registrations, as provided by 15 U.S.C. § 1115(b).

40.     Thorne actively uses, advertises, and markets all of the Thorne Trademarks in commerce throughout the United States.

41.     Thorne was founded in 1984 and has advertised, promoted, and sold products in interstate commerce under the Thorne name and trademarks since that time.  An example of the type of products sold under the Thorne name and trademarks is depicted below:



42.     Consumers and healthcare practitioners recognize Thorne as the name associated with manufacturing comprehensively-tested, high-quality, research-based supplements that are sustainably sourced from pure, premium ingredients.

43.     Thorne is known by consumers and healthcare practitioners for manufacturing supplement products that are "100% clean" – meaning they are free from harmful or unnecessary ingredients, including but not limited to eggs, fructose, sulfites, and TBHQ, among many others on the "Thorne No List."

44.     The Thorne name is recognized by consumers and healthcare practitioners for the quality of Thorne products and the rigorous quality controls and testing Thorne products are subject to.  Specifically, Thorne is known for having invested in two state-of-the-art in-house laboratories where it conducts four rounds of testing for its products, including: (1) testing every raw material and component in state-of-the-art in-house laboratories for contaminants; (2) testing every in-process batch for homogeneity and to confirm consistency; (3) testing every finished product to ensure its identity, potency, and purity have been maintained and that there has been no microbiological contamination during manufacturing; and (4) testing for product stability to confirm that the product will meet the label claim up to the product's time of expiration.

45.     Consumers and healthcare practitioners also associate Thorne with engaging in extensive clinical research to ensure proper formulation and function for its products.  Thorne is only one of a few supplement manufacturers to collaborate with the Mayo Clinic, and Thorne partners with several research organizations, including, but not limited to, the Cleveland Clinic, Columbia University, Emory, Johns Hopkins University, The University of Texas MD Anderson Cancer Center, and the University of South Carolina.

46.     Consumers and healthcare practitioners also are aware that as a result of Thorne's extensive testing processes, research, and quality controls, it is a NSF Certified facility and manufactures more than thirty NSF Certified for Sport® products, and is the proud exclusive nutritional supplemental provider for several U.S. National Teams.

47.     Thorne is also known by consumers and healthcare practitioners for having an exemplary record of compliance with the Current Good Manufacturing Practices (cGMP) set by the U.S. Food and Drug Administration, and is fully certified by Australia's Therapeutic Goods Administration, widely recognized as one of the toughest regulatory agencies in the world.

48.     For all of these reasons, the Thorne Trademarks are widely recognized by the general consuming public of the United States, and Thorne is recognized as the source of products bearing the Thorne Trademarks.

49.     Due to the superior quality and exclusive distribution of Thorne products, and because Thorne is uniquely recognized as the source of these high quality products, the Thorne Trademarks have substantial value.

**Online Marketplaces and the Challenges They Present to Thorne Product Quality and Goodwill**

50.     E-commerce retail sales have exploded over the past decade. From 2009 through the first half of 2023, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 15.4%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (September 12, 2023), https://fred.stlouisfed.org/series/ECOMPCTSA.

51.     In 2022 consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021. *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360 (February 17, 2023), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

52.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

53.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

54.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

55.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers. It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE

WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

56.    The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

57.    In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available    at    https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-*

9acc-1a89df23d0f3.pdf   Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

58.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, a brand owner's products are ingested by consumers.

59.     The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

60.     When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

61.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

62.    When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

63.    Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products:  online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

64.    Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

65.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family.  Jamie Pitman, *Local    Consumer    Review    Survey    2022*, BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.  The mere presence of reviews on an online product page can also increase conversion by up to 270% when compared to product pages that do not display reviews.  Tom Collinger, *How Online Reviews Influence Sales*, NORTHWESTERN UNIVERSITY, https://spiegel.medill.northwestern.edu/how-online-reviews-influence-sales/.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products

on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

66.    Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html. According to one study, 85% consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

67.    Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.  For all of these reasons, negative online reviews can be the death knell for a manufacturer's online product listings.

**Thorne's Reputation and Goodwill Have Been Harmed by Numerous Online Reviews Written by Consumers Who Purchased Poor-Quality Products from Unauthorized Sellers on Online Marketplaces**

68.    Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product

listings. These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

69.     Numerous consumers have written negative reviews of Thorne products being offered for sale on online marketplaces. In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Thorne products low "ratings" and complained of receiving products that were melted, opened, tampered with, burned, missing pieces, damaged, dirty, expired, foul-smelling, and of otherwise poor quality.

70.     For example, Defendants have sold on Amazon the product seen in the screenshot below:



71.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were opened, tampered with, burned, missing pieces, damaged, dirty, and of otherwise poor quality:

**Karissa**

⭐☆☆☆☆ **Unusable product**

Reviewed in the United States on August 28, 2023

Verified Purchase



Product came "safety sealed" but clearly tampered. Powder was exploding outside the lid. I don't feel safe consuming this product. No refunds. Things happen but that's a waste

Helpful | Report

---

**Amazon Customer**

⭐☆☆☆☆ **The container is burnt and impossible to open. I hope I can get a refund for this expensive product**

Reviewed in the United States on July 11, 2023

Verified Purchase



3 people found this helpful

Helpful | Report

---

**Blake**

⭐☆☆☆☆ **Didn't come with a scoop**

Reviewed in the United States on June 7, 2023

Verified Purchase

Impossible to use without the scoop...

One person found this helpful

Helpful | Report

---

**R. Shannon**

⭐☆☆☆☆ **Black specs inside**

Reviewed in the United States on June 3, 2023

Verified Purchase

Finally opened my package passed return date unfortunately and there's a lot black specs inside. Should be all white powder-not taking this

One person found this helpful

Helpful | Report

---

**FelixK9**

⭐☆☆☆☆ **Gross**

Reviewed in the United States on April 14, 2023

Verified Purchase

How is there a hair perfectly on the top as soon as I opened the container. I thought it was my hair but that wasn't possible because of the hair color.



Helpful | Report



72.   Below is a screenshot of another Thorne product that Defendants have sold on Amazon:



73.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were expired, foul-smelling, opened, partially empty, spoiled, and of otherwise poor quality:









74.    Below is a screenshot of another Thorne product that Defendants have sold on Amazon:



75.    As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were melted and stuck together:













76.     The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Thorne products listed on Amazon that Defendants have sold through their Amazon storefronts.   These reviews hurt Thorne's sales and goodwill because consumers around the world view and rely on these reviews, even when purchasing Thorne products offline.

Even when the text of a review makes clear that the problem was seller-caused, it will lower the Thorne product's average review score and search placement.

77.    Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Thorne Trademarks on Amazon and are not subject to Thorne's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the other similar negative reviews of Thorne products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Thorne Trademarks from Defendants.

**Thorne Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Cause by Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect from Thorne**

78.    The above reviews show how sales of poor quality Thorne products disappoint Thorne's consumers and cause significant harm to the reputation and goodwill of Thorne and its brands.  To protect itself and consumers from these harms, Thorne implemented a quality control program that applies to all of its Authorized Resellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

79.    The goals of Thorne's quality control program are to minimize the likelihood that poor quality products reach consumers and ensure that consumers who purchase Thorne products, including consumers who buy online, receive the high quality products and services they expect from products sold under the Thorne Brands.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Thorne Trademarks.

80.    Thorne's ability to exercise quality controls is particularly important for the products it sells because many Thorne products are ingested by consumers or applied to

consumers' bodies and there may be health and safety risks associated with products that are expired or have not been properly inspected, stored, or handled.

81.     Thorne abides by its quality control requirements and requires its Authorized Resellers to abide by them as well.

82.     Thorne's ability to exercise its quality controls is essential to the integrity and quality of Thorne products, as well as the value of the Thorne Trademarks and other intellectual property.

**Authorized Resellers May Sell Thorne Products Only Through Specific Channels and Must Adhere to Thorne's Quality Control and Customer Service Requirements**

83.     Thorne maintains its strict quality controls over Thorne products by conducting all sales through its Authorized Resellers.

84.     Most of Thorne's Authorized Resellers are physicians who sell Thorne products directly to their patients, including consultation services with those sales.

85.     Authorized Resellers are permitted to sell Thorne products only in approved channels and are required to abide by the Thorne Rules.  Thus, every Authorized Reseller that sells Thorne products is subject to Thorne's quality control requirements.

86.     The Thorne Rules are binding contracts between Thorne and its Authorized Resellers.  Authorized Resellers agree to follow the Thorne Rules in exchange for the right to purchase products from Thorne and use Thorne's intellectual property.

87.     To prevent third parties from acquiring and reselling Thorne products, the Thorne Rules require Authorized Resellers to purchase the Thorne products they resell only from Thorne or other Authorized Resellers.  The Thorne Rules also permit Authorized Resellers to sell products only to end users.  Authorized Resellers are prohibited from selling Thorne products to anyone who intends to resell the products.  This restriction ensures that Authorized Resellers exclusively

sell products that were subject to Thorne's quality controls and do not sell products that are diverted, unsafe, or potentially counterfeit.

88.    The Thorne Rules also limit to whom and where Authorized Resellers may sell Thorne products.  To prevent persons outside of Thorne's quality controls from acquiring and reselling Thorne products, the Thorne Rules prohibit Authorized Resellers from selling Thorne products to any third party who is not an Authorized Reseller and who intends to resell the products.  Authorized Resellers are permitted to sell Thorne products only to end user consumers or, in certain circumstances, to other Authorized Resellers.

89.    Given the many perils of unauthorized online sales as described above, Authorized Resellers are also prohibited from selling Thorne products on any website they do not themselves own and operate, including third-party marketplaces such as Amazon, eBay, Walmart Marketplace, or Craigslist, without prior written consent from Thorne.

90.    The Thorne Rules require Authorized Resellers to adhere to Thorne's quality control requirements.

91.    These restrictions allow Thorne to exercise its quality controls over Thorne products because they: (1) prevent unauthorized sellers from obtaining and reselling Thorne products and (2) allow Thorne to know where all of its products are being sold online by Authorized Resellers.  If a quality issue arises through an online sale, Thorne can identify the Authorized Reseller that made the sale, contact the Authorized Reseller, and address the issue immediately.  Thorne is unable to take such actions with unauthorized sellers because it does not know whom those sellers are and cannot obtain their cooperation in addressing any product quality or customer service issues that may arise.

92.     In addition to restricting where and how Authorized Resellers can acquire and sell Thorne products, the Thorne Rules also require Authorized Resellers to follow numerous quality control requirements related to the inspection, storage, handling, and sale of Thorne products.

93.     To ensure that customers receive the genuine and high-quality products they expect from Thorne, the Thorne Rules require Authorized Resellers to inspect all products for damage, including defects, broken seals, and other non-conformances, and remove all such products from inventory.

94.     The Thorne Rules also require that Authorized Resellers store Thorne products in accordance with any storage guidelines and as otherwise specified by Thorne, including storing the products in a cool, dry place, away from direct sunlight, extreme heat, and dampness.

95.     To avoid consumer confusion and ensure that customers receive genuine Thorne products, Authorized Resellers are prohibited from relabeling, repackaging, or altering Thorne products.  Authorized Resellers must not remove, translate, or modify the contents of any label or literature on or accompanying Thorne products.  Further, Authorized Resellers are prohibited from tampering with, defacing, or otherwise altering any identifying information on Thorne products, including serial numbers, lot codes, batch codes, and UPCs.

96.     Following the sale of genuine Thorne products, Authorized Resellers must also supply ongoing support to end-user consumers, provide prompt customer service, and assist with recalls and other consumer safety information efforts.

97.     Authorized Resellers must also cooperate with any product tracking Thorne implements or utilizes.  In particular, Thorne currently uses QR codes on 90% of its products, and Authorized Resellers are not permitted to alter or otherwise interfere with those codes.

98.    The Thorne Rules give Thorne the right to monitor and audit Authorized Resellers by inspecting their facilities and records relating to Thorne products, to ensure their compliance with Thorne's quality control requirements.  During any such investigation, Authorized Resellers must disclose information regarding their handling procedures and the identities of all their sources of Thorne products.

99.    Authorized Resellers also must cooperate with Thorne with respect to any product recall or other consumer safety information dissemination effort conducted by Thorne regarding Thorne products.

100.    The Thorne Rules also require Authorized Resellers to provide various customer services to their customers.  For example, Authorized Resellers must familiarize themselves with the features of all Thorne products kept in their inventory so they can advise customers on the selection and safe use of Thorne products, offer ongoing support to consumers, and promptly respond to consumer inquiries before and after their sale of Thorne products.  Authorized Resellers must also immediately report to Thorne any customer complaint they receive regarding a Thorne product and assist Thorne in investigating any such complaint.

101.    Thorne's quality control and customer service requirements are legitimate and substantial and have been implemented so that Thorne can control the quality of goods manufactured and sold under the Thorne Trademarks, to protect consumers as well as the value and goodwill associated with the Thorne Trademarks.

102.    Thorne's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Thorne product they were considering buying was being sold by an Authorized Reseller

who is subject to Thorne's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Thorne's quality controls and over whom Thorne is unable to exercise its quality controls.

**Because of the Flood of Poor-Quality Products Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Thorne Imposes Additional Requirements on Its Authorized Resellers Who Sell Online**

103.    As shown in the consumer reviews cited above (see ¶¶ 68-77, *supra*), Thorne products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them.   These problems are especially severe on online marketplaces, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product-listing page.   Given the heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Thorne imposes additional quality control requirements on all of its Authorized Resellers that sell Thorne products online.

104.    The Thorne Rules allow Authorized Resellers to sell Thorne products to end-user consumers only through "Permissible Public Websites" and "Approved Websites."   These rules allow Thorne to oversee all Authorized Resellers that sell Thorne products online.

105.    A "Permissible Public Website" is a website that: (1) is operated by an Authorized Reseller in the Authorized Reseller's own legal name or registered fictitious name; (2) lists the Authorized Reseller's name, mailing address, telephone number, and email address; and (3) has been registered with Thorne.  Permissible Public Websites do not include storefronts on any online marketplace.

106.    Authorized Resellers must receive prior written approval from Thorne before they can sell Thorne products on any website that does not meet the criteria of a Permissible Public

Website.  To obtain this approval, Authorized Resellers must submit applications in which they provide information about their business, identify all their sources of Thorne products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Thorne that includes review of their business operating business record and online review history.  A website that Thorne permits an Authorized Reseller to use through this process is called an "Approved Website."

107.    The Thorne Rules impose numerous additional requirements on Authorized Resellers who sell Thorne products on Permissible Public Websites or Approved Websites (collectively, "Authorized Online Resellers").

108.    For example, Authorized Online Resellers must exclusively use images of Thorne products that are provided or approved by Thorne and keep product descriptions up to date. Authorized Online Resellers are also prohibited from advertising any Thorne product they do not carry in their inventory.

109.    The Thorne Rules prohibit Authorized Online Resellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Thorne or another third party.  These requirements allow consumers of Thorne products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Thorne to protect the public from the sale of poor quality or counterfeit Thorne products because it allows for easy detection of any Authorized Online Reseller that sells poor quality or counterfeit goods.

110.    Authorized Online Resellers who sell Thorne products on Approved Websites may sell products only on the website(s) and under the name(s) specifically approved by Thorne.  At

Thorne's request, Authorized Online Resellers must provide access to and copies of all web pages that make up any Permissible Public Website or Approved Website where Authorized Online Resellers are selling Thorne products.

111.    Unless otherwise approved by Thorne, Authorized Online Resellers may not use any third-party fulfillment service to store inventory or fulfill orders for Thorne products. Authorized Online Resellers are also prohibited from using any fulfillment service that could cause customers to receive Thorne products from other sellers' product stock when they purchase from Authorized Online Resellers.  These requirements ensure that the specific products that the Authorized Online Reseller has that meet Thorne's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Thorne's quality controls.

112.    All websites where Authorized Online Resellers sell Thorne products must have a mechanism for receiving customer feedback, and Authorized Online Resellers must take appropriate steps to address any feedback received.  Authorized Online Resellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Resellers' products and their responses; (ii) provide this information to Thorne upon request; and (iii) cooperate with Thorne in investigating negative online reviews related to sales of Thorne products.

113.    The additional quality control requirements that Thorne imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Thorne to carefully control the quality of Thorne products that are sold online and quickly address any quality issues that arise.

114.    Thorne's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Thorne products online receive genuine, high-quality Thorne products that abide by Thorne's quality controls. Consumers purchasing Thorne products online would find it relevant to their purchasing decision to know whether a product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, Thorne's quality controls.

**Genuine Thorne Products Come With Thorne's Satisfaction Guarantee; Products Sold by Defendants Do Not**

115.    Thorne products purchased from Thorne directly or an Authorized Reseller also come with a 60-Day Money Back Guarantee ("Guarantee"). Under the Guarantee, customers who are not satisfied with an item that they purchased from Thorne or its Authorized Resellers may return it within 60 days from the order date for a full refund of the purchase price.

116.    As discussed above, Thorne cannot ensure the quality of the products sold by unauthorized sellers because they are not subject to Thorne's quality controls. For this reason, products sold by unauthorized sellers, like Defendants, do not include the Guarantee.

117.    The Guarantee is a material component of genuine Thorne products. Consumers who purchase Thorne products with the Guarantee receive the peace of mind that they are receiving a high-quality product, Thorne stands behind the product, and they can return the product to Thorne for a refund if they are dissatisfied.

118.    Consumers would find it material and relevant to their purchasing decision to know whether a Thorne product they were considering buying was covered by the Guarantee. If consumers knew a product did not come with the Guarantee, they would be less likely to buy it.

119.    Indeed, consumers on Thorne product listings on Amazon have complained of being unable to return products, showing that they were disappointed after purchasing products from unauthorized sellers that did not include the Guarantee.  An example is shown below:



**Defendants Are Not Authorized Resellers and Are Illegally Selling Non-Genuine Products Bearing the Thorne Trademarks**

120.    Because the unauthorized sale of Thorne products on the Internet threatens the reputation and goodwill associated with the Thorne Trademarks, Thorne actively monitors the sale of its products online.

121.    In the course of this monitoring, Thorne discovered that high volumes of products bearing the Thorne Trademarks were being illegally sold through the "BH Prime" Storefront. Through investigation, Thorne identified Defendants as the operators of the Storefront and as the parties who are responsible for the unlawful sale of products bearing the Thorne Trademarks through the Storefront.

122.    Defendants are not Authorized Resellers of Thorne products and are not subject to, and do not comply with, the Thorne Rules or the quality controls that Thorne imposes on its Authorized Resellers.

123.    Defendants' "BH Prime" Storefront lists its "Business Name" as "Inventory Partners LLC" and its "Business Address" as the Roberts Lane Address at which both Morad and Ryan Shema reside.

124.    Additionally, as part of Thorne's investigation, it issued a subpoena to Amazon.com, Inc. in connection with a prior litigation for information related to the owners and operators of "BH Prime."  In response to the subpoena, Amazon.com, Inc. provided the name "Morad Shema" and the email address inventorypartnersllc@gmail.com.

125.    Thorne also conducted test purchases of Thorne products from the "BH Prime" Storefront.  Through Thorne's specialized product tracking system, Thorne was able to track the products received from the test purchases from the "BH Prime" Storefront to a Thorne account set up by Lavi, who is a former Thorne Authorized Reseller.

126.    On September 1, 2021, counsel for Thorne sent a cease-and-desist letter to Inventory Partners LLC at the Roberts Lane Address via overnight mail.  The letter explained that Defendants are infringing the Thorne Trademarks by selling products that are materially different from genuine products sold by Thorne's Authorized Resellers and that are not subject to, do not abide by, and interfere with Thorne's quality controls.  The letter also explained that Defendants are tortiously interfering with Thorne's contracts by purchasing products from Authorized Resellers, who are prohibited from selling products to persons or entities who are not Authorized Resellers and who resell the products.  The letter also informed Defendants that Thorne is located in South Carolina, is harmed in South Carolina as a result of Defendants' illegal sales of infringing products bearing the Thorne Trademarks, and that Defendants will be subject to personal jurisdiction in South Carolina if Thorne files suit.  Thorne's letter demanded that Defendants permanently cease selling products bearing the Thorne Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

127.   On September 9, 2021, counsel for Thorne sent a follow-up letter to Inventory Partners LLC, again demanding that Defendants stop selling products bearing the Thorne Trademarks.

128.   On January 7, 2022, counsel for Thorne sent an additional follow-up letter and a draft complaint to Variazioni, Lavi, and Inventory Partners via overnight mail and email at the Roberts Lane Address and Pinewood Road Address and to support@variazioni.com and josh@variazioni.com.

129.   Defendants did not respond to these letters.

130.   Because Lavi was using his Thorne account to sell Thorne products unlawfully and in violation of the Thorne Rules, Thorne terminated Lavi's Thorne account and his status as an Authorized Reseller.   Thereafter, the "BH Prime" Storefront temporarily stopped listing and selling products.

131.   However, thereafter, Thorne discovered that the "BH Prime" Storefront began to list and sell Thorne products again.  Thorne conducted additional test purchases of Thorne products from the Storefront during various months in 2023.

132.   Using its tracking system, Thorne tracked the products received from the test purchases to a Thorne account operated by Vasesource Purchasing—for which corporate records identify Ryan Shema as the sole member and registered agent (the "Vasesource Thorne Account").

133.   The Vasesource Thorne Account was created in or around November 2022 when Vasesource Purchasing began purchasing products from Thorne.

134.   Vasesource Purchasing also entered into a Customer Purchase Agreement (the "Purchase Agreement") on December 8, 2022.  The Purchase Agreement was signed by "Ronnie Goodman, Senior Purchaser" on behalf of Vasesource Purchasing.

135.    Counsel for Thorne also sent a cease-and-desist letter to Vasesource Purchasing via email to ronnie@vasesource.com and via overnight mail on October 6, 2023 reiterating the contents of the September 1, 2021 letter.  Thorne received no response to that letter.

136.    Upon information and belief, Defendants created the Vasesource Thorne Account in order to continue to sell Thorne products through, at minimum, the "BH Prime" Storefront and evade detection by Thorne.

137.    Defendants requested that products purchased from Thorne by the Vasesource Thorne Account be sent to one of the two addresses that are the principal places of business for Vasesource and Vasesource Sales—the Dwight Place Address and the W. 28th Street Address.

138.    The retail website for Vasesource and Vasesource Sales, www.vasesource.com, lists both the Dwight Place Address and the W. 28th Street Address.

139.    Yakobi also holds himself out on social media as the owner and founder of Vasesource.

140.    Goodman communicated with Thorne to apply for the Vasesource Thorne Account and signed all of his emails as "Senior Purchaser at VASESOURCE" with a URL to vasesource.com, the W. 28th Street Address, and the phone number "516-993-7882."

141.    Based on Thorne's investigation, the phone number "516-993-7882" is associated with Morad.

142.    On information and belief, all of the products Defendants purchased from Thorne through Lavi's Thorne account and the Vasesource Thorne Account were resold by Defendants on Amazon through, at least, the BH Prime Storefront.

143.    On information and belief, Defendants purchased products from Thorne through the Vasesource Thorne Account and instructed Thorne to ship those products to Dwight Place and

W. 28th Street Addresses so that Defendants could resell those products on the Amazon Storefront and evade detection by Thorne.

144.    In his communications with Thorne about creating the Vasesource Thorne Account, Goodman represented to Thorne that Vasesource Purchasing was purchasing the products as part of a corporate gifting program.

145.    In the Purchase Agreement,[2] Vasesource Purchasing agreed that it was purchasing Thorne products "for its corporate gifting program and not for resale."

146.    Vasesource Purchasing also agreed in the Purchase Agreement that it was prohibited from marketing or selling Thorne products through any third-party marketplace websites, including Amazon.

147.    Vasesource Purchasing identified its address in the Purchase Agreement as the Dwight Place Address associated with Vasesource and Vasesource Sales.

148.    Because Defendants were using the Vasesource Thorne Account to sell Thorne products unlawfully and in violation of the Thorne Rules, Thorne terminated the Vasesource Thorne Account and Vasesource Purchasing's status as an Authorized Reseller.

149.    Defendants' disregard of Thorne's extensive correspondence and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

150.    Defendants have sold – and are continuing to sell – a high volume of infringing products bearing the Thorne Trademarks through the "BH Prime" Storefront.  Monitoring software

---

[2] Thorne has not filed the Purchase Agreement with its complaint because the Agreement is confidential and is in the possession of one or more Defendants.

estimates that Defendants have sold more than 30,000 infringing products through the Storefront, for revenue in excess of $1.2 million.

151.    Upon information and belief, through their Amazon Storefront, Defendants accept and fulfill orders from South Carolina residents for products bearing the Thorne Trademarks and cause substantial quantities of infringing products bearing the Thorne Trademarks to be shipped to persons located in South Carolina through the regular course of business.

**Defendants Are Infringing the Thorne Trademarks by Selling Products Bearing the Thorne Trademarks That Are Not Subject to, Do Not Abide by, and Interfere With Thorne's Quality Control and Customer Service Requirements**

152.    Defendants, without authorization from Thorne, have sold – and continue to sell – products bearing the Thorne Trademarks through the "BH Prime" Storefront.  Defendants may also be selling products through additional channels that Thorne has not yet discovered and cannot discover until it is able to take discovery.

153.    Defendants are not Authorized Resellers of Thorne products, and the products sold by Defendants are not genuine Thorne products because they are not subject to, do not abide by, and interfere with Thorne's quality control and customer service requirements that Authorized Resellers must follow.

154.    Thorne's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject, do not abide by, and interfere with these requirements, Thorne has lost control of the quality of goods that bear its trademarks.

155.    Defendants do not abide by Thorne's quality control requirements because they have not provided Thorne with their business information nor given Thorne an opportunity to vet them to determine if they meet Thorne's high standards for what it demands of its Authorized

Resellers that it approves to sell Thorne products online through Approved Websites. Instead, Defendants sell products on online marketplaces in violation of the Thorne Rules and without Thorne's authorization or oversight.

156.    Defendants do not comply with Thorne's quality control requirements—and interfere with Thorne's quality controls—because they have not disclosed to Thorne where they sell Thorne products online. Defendants also do not provide customer feedback to Thorne that relates to their sales of products bearing the Thorne Trademarks or cooperate with Thorne in investigating negative online reviews relating to their sales of products bearing the Thorne Trademarks, as Authorized Online Sellers are required to do. These actions prevent Thorne from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Thorne Trademarks.

157.    Defendants also do not comply with Thorne's quality control requirements—and interfere with Thorne's quality controls—because they: (1) have not disclosed to Thorne where they acquire products that bear the Thorne Trademarks; and (2) have not given Thorne the right to audit and inspect their facilities and records. As a result, among other things, Thorne cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products and delivery vehicles, and not selling poor quality or expired products; (iii) selling products only in official and unaltered Thorne packaging; (iv) not selling any products that were returned, opened, or repackaged; (v) improperly allowing products that have been returned or repackaged to be listed as "new" products; (vi) preventing their products from being commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; (vii) sending to consumers the same product that they ordered; and (viii) providing exceptional customer service and responding appropriately to

feedback received from customers.  Thorne also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

158.    Numerous customers have written numerous reviews of Defendants' Amazon Storefront in which they complained of receiving products that were fake, damaged, opened, not as ordered, empty, melted, unsealed, old, and of otherwise poor quality[3]:



★☆☆☆☆    "This is not the real product"
By mark krutzky on February 13, 2023.



★☆☆☆☆    "The seller offered a full refund for the poor quality product, but I never received it"
By Kyryl on August 24, 2023.
**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.



★☆☆☆☆    "Wrong item - you sent Thorne emotion balance support"
By NP on August 13, 2023.
**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.



★☆☆☆☆    "I have never received my purchase. It supposed to come with the other products I bought. But, it wasn't on the box."
By Eleide Shelton on August 3, 2023.
**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

[3] When Amazon sellers utilize the "Fulfillment by Amazon" service, Amazon itself is responsible for shipping the items.  At a third-party seller's request, Amazon is able to "strike" a negative review as attributable to Amazon, not the seller—even in situations where, as here, the issues are plainly related to the quality of the seller's product.  Although Amazon has added comments to most of these complaints stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the complaints, the issues and complaints that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants.  *See* https://sell.amazon.com/fulfillment-by-amazon.

★☆☆☆☆    " Shipment arrived late and all of the capsules are stuck together inside the bottle so I can only get a few out. Please issue me a refund or send me a replacement bottle. "

Read less

By James Melcer on August 2, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " Product was crushed when arrived. When opened, it was filled with WATER. "

By Lee Gilbreath on July 30, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " My order was delivered and all the capsules are stuck together- i cant use them! "

By AB on July 28, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " Came in melted into one solid unusable piece "

By PK on July 26, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " Half bottle gone "

By Nj on July 26, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " Seal under cap was off at time of opening. Not safe to use product. "

By Amazon Customer on July 25, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " The item is not of good quality and appears to be old and aged. The label on the bottle is all wrinkled, and more importantly the capsules are not the light yellowish color and soft powder as typical quality received. The capsules received are dark and hard feeling, stale and aged, not full and some cracked and broken. Not of the quality and standard received in the past. "

Read less

By Nicolas on July 24, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    " Fake product "

By ALEKSANDRA on July 13, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "I just received the "Waterford" candlesticks that I purchased for a wedding gift. This purchase was over $150.00 and arrived in a cheap beat up box and "Waterford" container that was split with a crunched lid! I am very doubtful that this is a true Waterford product as it resembles a China copy! The crystal cloudy and light. Very upset about this!"

Read less

By K. Gosney on June 30, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "Scam, different product inside container"

By Cheryl Blair on June 28, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "This item has no smell to it. It's like water down I'm not happy at all."

By Sierra J. on June 28, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "This bottle came damaged with a hole in the side of it, tried to hit replace and it won't allow!!!!!!!!"

By Amazon Customer on June 23, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "its fake"

By Maria on June 21, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "The product does not look new, the quantity is significantly small, the container was not full disappointingly."

By liat on June 18, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "Totally counterfeit. I'm fighting for a refund now. DO NOT WASTE YOUR MONEY ON THIS."

By jennifer m. on June 2, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "Very near expiration date, less than 6 months, and the seller said they'll refund but instead disappeared."

By Chris on May 29, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆ "do not buy from this seller. Everything is fake! very upset!"

By Amazon Kunde on May 27, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    "~~Item was delayed 4 weeks, then delivery was canceled without giving a reason ..?~~"

By Kevin on April 26, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆    "~~second one with the wrong lid.. returned it to get a new lid and the wrong lid came again..so difficult to contact the seller to just get the right lid..I'm returning it again and looking elsewhere~~"

Read less

By Miss Marple on April 5, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆    "~~Product they sent me looked like it was previously used~~"

By Kathi P. on March 22, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆    "~~This is a fake~~"

By Amazon Customer on March 18, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆    "~~I received this bottle smashed in shipment today. Why am I not able to return vitamins that are crushed?~~"

By Dissatisfied Customer on February 20, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

---

★☆☆☆☆    "~~Item arrived cracked with entirety of product leaked out. Complete waste of money for the poor shipping standard.~~"

By Mssyska on January 30, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

159.    These reviews are only a sample of the negative reviews that customers have written about Defendants and their "BH Prime" Storefront.

160.    Upon information and belief, Defendants have repeatedly asked Amazon to strike through negative reviews, including but not limited to the ones shown above, so that Defendants can attempt to avoid responsibility for the fake and poor-quality products they are selling.

161.    Thorne allows its products to be sold only by Authorized Resellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

162.    The fact that Defendants are not following certain quality controls or customer service requirements is apparent from a review of the Infringing Storefronts, which have multiple negative reviews.

163.    These reviews, along with the numerous negative reviews of Thorne products Defendants have sold in which customers complained of similar issues, *see supra* ¶¶ 68-77, show that Defendants are not carrying out the quality control inspection, storage, handling, or customer service requirements that Thorne requires Authorized Resellers to follow for Thorne products. Instead, Defendants are providing poor customer service and likely selling products bearing the Thorne Trademarks that are damaged, tampered with, not sealed, previously used, very old, and expired.  These sales cause customers to write highly negative reviews of Thorne products that harm Thorne's reputation and hurt the placement of Thorne products in search results.

164.    Defendants' failure to abide by the Thorne Rules prevents Thorne from exercising control over the quality of products Defendants sell bearing the Thorne Trademarks.  Unlike with its Authorized Online Sellers, Thorne cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

165.    Through their unauthorized use of the Thorne Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Thorne products.  In reality, however, the products sold by Defendants are materially different from genuine Thorne products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Thorne's quality control and customer service requirements that Authorized Resellers must follow.

166.   As set forth above, genuine Thorne products purchased from an Authorized Reseller come with the Thorne Guarantee.  However, Thorne does not provide the Guarantee for products purchased from sellers that are not Authorized Resellers because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

167.   Because Defendants are not Authorized Resellers and are, thus, not subject to Thorne's quality control requirements, the products bearing the Thorne Trademarks that Defendants sell do not come with the Thorne Guarantee.

168.   Because the products Defendants sell do not come with the Guarantee, they are materially different from genuine Thorne products.

169.   The Thorne Guarantee is a material component of genuine Thorne products. Consumers considering whether to purchase Thorne products would find it relevant to their purchasing decision to know whether the product they are purchasing are covered by the Guarantee.  Consumers who purchase Thorne products with the Guarantee receive the peace of mind that they are receiving a high quality product, that Thorne stands behind the product, and that they can get a refund if they are not completely satisfied.

170.   Defendants' unauthorized sale of non-genuine products bearing the Thorne Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Thorne products that come with the Thorne Guarantee when, in fact, they are not.

171.   Defendants' actions infringe on the Thorne Trademarks and diminish their value.

172.   Further, Defendants' disregard of communications from Thorne and continued selling of infringing products despite being informed of their unlawful conduct, demonstrates that they are acting intentionally, willfully, and maliciously.

173.    Upon information and belief, the "BH Prime" Storefront regularly accepts and fulfills orders from South Carolina residents for infringing products bearing the Thorne Trademarks and ships those products to persons in South Carolina.

174.    Furthermore, the "BH Prime" Storefront offers products for sale as "Fulfilled by Amazon," often referred to as "FBA."

175.    The FBA service requires Defendants to ship their products to Amazon's warehouses.  When sold, the products are shipped directly from Amazon to the buyer.  Amazon does not contact Defendants for their approval of purchases.  Defendants retain ownership of the products they store at Amazon warehouses until they are purchased by consumers.

176.    By selling items FBA, Defendants agreed to have their products stored in Amazon facilities across the country, including at the four distribution centers located in Spartanburg, Charleston, and West Columbia, South Carolina.

177.    By using the FBA service, Defendants agreed to have their products stored across the United States, including in any one of the fulfillment centers in South Carolina.  *See Amazon FBA: Fulfillment services for your ecommerce business*, https://sell.amazon.com/fulfillment-by-amazon.



178.    Defendants' high volume of Amazon sales indicates that Defendants are, and were, selling Thorne-branded products obtained from unauthorized sellers on their Amazon Storefront.

### Defendants Are Tortiously Interfering With Thorne's Agreements With Its Authorized Resellers

179.    As discussed, Thorne allows Thorne products to be sold only by Authorized Resellers.

180.    Thorne has entered into agreements with all of its Authorized Resellers that prohibit Authorized Resellers from selling Thorne products to entities or persons who are not Authorized Resellers and who Authorized Resellers know, or reasonably should know, are going to resell the products.

181.    Defendants have sold and are continuing to sell a high volume of products bearing the Thorne Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Resellers.  Thus, upon information and belief, Defendants have purchased products from Authorized Resellers for the purpose of reselling them on the Internet.

182.    By purchasing products from Authorized Resellers and then reselling them on the Internet, Defendants caused and induced Authorized Resellers to breach their agreements with Thorne.

183.    Defendants have known that Thorne's contracts with its Authorized Resellers prohibit Authorized Resellers from selling products to non-Authorized Resellers, such as Defendants, who the Authorized Resellers know or have reason to know are going to resell the products.

184.    Defendants have known of this prohibition since approximately September 1, 2021. On or around that date, Defendants received a cease-and-desist letter informing them that Thorne has agreements with all of its Authorized Resellers that prohibit them from selling Thorne products to any person or entity that, like Defendants, is not an Authorized Reseller but intends to resell the products. Thorne's letter also informed Defendants that: (i) by purchasing Thorne products from an Authorized Reseller for the purpose of reselling them, they were causing a breach of the agreement between Thorne and its Authorized Reseller and were interfering with Thorne's agreements and business relationships; and (ii) if Defendants continued to acquire products from Thorne's Authorized Resellers for the purpose of reselling them, they would be liable for tortiously interfering with Thorne's contracts and business relationships with its Authorized Resellers.

185.    Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Thorne's agreements with its Authorized Resellers by inducing Authorized Resellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

186.    In interfering with Thorne's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Thorne products from Authorized Resellers—

and in so doing, instigated a breach of Authorized Resellers' agreements with Thorne—so that Defendants could unlawfully infringe upon and materially damage the value of the Thorne Trademarks by reselling the products on the Internet, thereby committing an independent tort.

187.    Defendants are not parties to the agreements they caused Authorized Resellers to breach.

**Thorne Has Suffered Significant Harm as a Result of Defendants' Conduct**

188.    Thorne has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

189.    Thorne has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

190.    Thorne is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Thorne products, causing continued irreparable harm to Thorne's reputation, goodwill, relationships, intellectual property and brand integrity.

191.    Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

192.    Defendants' willful violations of the Thorne Trademarks and continued pattern of misconduct demonstrate intent to harm Thorne.

**FIRST CAUSE OF ACTION**
**Trademark Infringement Against All Defendants**
**15 U.S.C. §§ 1114**

193.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

194.    Thorne is the owner of the Thorne Trademarks.

195.    Thorne has registered the Thorne Trademarks with the USPTO.

196.    The Thorne Trademarks are valid and subsisting trademarks in full force and effect, and their registration is conclusive evidence of Thorne's ownership and exclusivity rights under 15 U.S.C. § 1065.

197.    Defendants willfully and knowingly used, and continue to use, the Thorne Trademarks in commerce for purposes of selling infringing products bearing the Thorne Trademarks on the Internet without Thorne's consent.

198.    The products Defendants sell bearing the Thorne Trademarks are not authorized for sale by Thorne.

199.    The products Defendants sell bearing the Thorne Trademarks are materially different from genuine Thorne products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Thorne has established.

200.    Defendants' unauthorized sale of materially different products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests the products Defendants offer for sale are genuine Thorne products when they are not.

201.    Defendants' unauthorized sale of materially different products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Thorne when, in fact, they are not.

202.    Defendants' unauthorized use of the Thorne Trademarks has infringed upon and materially damaged the value of the Thorne Trademarks and caused significant damage to Thorne's business relationships.

203.    As a proximate result of Defendants' actions, Thorne has suffered, and will continue to suffer immediate and irreparable harm.  Thorne has also suffered, and continues to suffer damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

204.    Thorne is entitled to recover its damages caused by Defendants' infringement of the Thorne Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

205.    Thorne is entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Thorne will suffer irreparable harm.

206.    Thorne is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Thorne Trademarks.

207.    Thorne is also entitled to reasonable attorneys' fees as this case is exceptional under 15 U.S.C. § 1117(a).

## SECOND CAUSE OF ACTION
### Unfair Competition Against All Defendants
### 15 U.S.C. § 1125(a)

208.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

209.    As set forth above, Defendants are selling infringing products bearing the Thorne Trademarks that are materially different from genuine Thorne products.

210.    Defendants' sale of infringing products bearing the Thorne Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Thorne when they are not.

211.    Defendant's conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

212.    Thorne is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Thorne will suffer irreparable harm.

213.    Thorne is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Thorne Trademarks.

214.    Thorne is also entitled to reasonable attorneys' fees as this case is exceptional under 15 U.S.C. § 1117(a).

### **THIRD CAUSE OF ACTION**
**Common Law Trademark Infringement Against All Defendants**

215.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

216.    Thorne is the owner of the Thorne Trademarks.

217.    Thorne has registered the Thorne Trademarks with the USPTO.

218.    The Thorne Trademarks are valid and subsisting trademarks in full force and effect, and their registration is conclusive evidence of Thorne's ownership and exclusivity rights under 15 U.S.C. § 1065.

219.    Defendants willfully and knowingly used, and continue to use, the Thorne Trademarks in commerce for purposes of selling infringing products bearing the Thorne Trademarks on the Internet without Thorne's consent.

220.    The products Defendants sell bearing the Thorne Trademarks are not authorized for sale by Thorne.

221.    The products Defendants sell bearing the Thorne Trademarks are materially different from genuine Thorne products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Thorne has established.

222.    The products Defendants sell bearing the Thorne Trademarks are materially different from genuine Thorne products because they do not come with the customer service benefits that accompany genuine Thorne products.

223.    Defendants' unauthorized sale of materially different products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests the products Defendants offer for sale are genuine Thorne products when they are not.

224.    Defendants' unauthorized sale of materially different products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Thorne when, in fact, they are not.

225.    Defendants' unauthorized use of the Thorne Trademarks has infringed upon and materially damaged the value of the Thorne Trademarks and caused significant damage to Thorne's business relationships.

226.    As a proximate result of Defendants' actions, Thorne has suffered, and continues to suffer, immediate and irreparable harm.  Thorne has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

227.    Thorne is entitled to recover its damages caused by Defendants' infringement of the Thorne Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

228.    Thorne is also entitled to punitive damages because Defendants acted maliciously toward Thorne or in an intentional disregard of the rights of Thorne.

### FOURTH CAUSE OF ACTION
**Unfair and Deceptive Trade Practices Against All Defendants**
**S.C. Code §§ 39-5-10 *et seq*.**

229.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

230.    Thorne is the owner of the Thorne Trademarks.

231.    Thorne has registered the Thorne Trademarks with the USPTO.

232.    The Thorne Trademarks are valid and subsisting trademarks in full force and effect, and their registration is conclusive evidence of Thorne's ownership and exclusivity rights under 15 U.S.C. § 1065.

233.    Defendants willfully and knowingly used, and continue to use, the Thorne Trademarks in interstate commerce for the purpose of advertising, promoting, and selling infringing Thorne products on the Internet without the consent of Thorne.

234.    Defendants' unauthorized sale of products bearing the Thorne Trademarks interferes with Thorne's ability to exercise quality control over products bearing the Thorne Trademarks because Thorne is unable to audit Defendants to confirm they are complying with Thorne's quality control requirements and close their account if they fail to comply with Thorne's quality control requirements.

235.    The products Defendants sell are materially different from genuine Thorne products because they are not subject to, and interfere with, Thorne's quality controls.

236.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Thorne Trademarks misrepresents the

nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products are subject to Thorne's quality control requirements when they are not.

237.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Thorne products when they are not.

238.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Thorne when they are not.

239.    Defendants' unauthorized and deceptive use of the Thorne Trademarks is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that products Defendants advertise using the Thorne Trademarks are genuine Thorne products that are subject to, and abide by, Thorne's quality control requirements and come with benefits associated with authentic Thorne products when they do not.

240.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of Thorne Products is an unfair and deceptive trade practice under the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code. § 39-5-10 *et seq*.

241.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of Thorne Products has impacted, and will continue to impact, the public interest by deceiving customers into believing that the products Defendants offer for sale are genuine and authentic Thorne products when they are not and that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Thorne when they are not.

242.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of Thorne Products has the potential for repetition because: (i) Defendants have taken the same or similar actions in the past and continue to advertise and sell Thorne products, despite Thorne's termination of Thorne purchasing accounts being used by Defendants and Defendants' receipt of cease-and-desist letters; and (ii) Defendants' actions create a potential for repetition.

243.    As a result of Defendants' unlawful actions, Thorne has suffered, and continues to suffer, irreparable harm.  Thorne has also suffered, and continues to suffer, damages, including loss of business, goodwill, reputation, and profits, in an amount to be proven at trial.

244.    Thorne is entitled to damages, including punitive and treble damages, pursuant to S.C. Code § 39-5-140.

245.    Thorne is entitled to attorneys' fees and costs pursuant to S.C. Code § 39-5-140.

246.    Thorne is entitled to injunctive relief pursuant to S.C. Code § 39-5-50.

**FIFTH CAUSE OF ACTION**
**Tortious Interference with Contract and Business Expectancy Against All Defendants**

247.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

248.    Thorne products are sold to the public exclusively through Thorne's network of Authorized Resellers.

249.    Thorne has entered into valid and enforceable agreements with its Authorized Resellers to sell Thorne products.  These agreements specifically prohibit Authorized Resellers from selling Thorne products to unauthorized resellers such as Defendants.

250.    Defendants are not Authorized Resellers of Thorne products.  Despite this, Defendants have sold and are continuing to advertise and sell a high volume of products bearing

the Thorne Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Resellers.

251.    Thus, upon information and belief, Defendants have purchased Thorne products from Authorized Resellers for the purpose of reselling them on the Internet.

252.    By purchasing products from Authorized Resellers and then reselling them on the Internet, Defendants caused and induced Authorized Resellers to breach their agreements with Thorne.

253.    Defendants have known that Thorne's contracts with its Authorized Resellers prohibit Authorized Resellers from selling products to non-Authorized Resellers, such as Defendants, who the Authorized Resellers know or have reason to know are going to resell the products.

254.    Defendants have known of this prohibition, among other reasons, because Thorne informed Defendants of this prohibition in a cease-and-desist letters it emailed and mailed to Defendants as early as September 1, 2021.  Defendants also advised Defendants of this prohibition in extensive subsequent correspondence.

255.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Thorne's agreements with its Authorized Resellers by continuing to induce Authorized Resellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

256.    In interfering with Thorne's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Thorne products from Authorized Resellers — and in so doing, instigated a breach of Authorized Resellers' agreements with Thorne—so that

Defendants could unlawfully infringe upon and materially damage the value of the Thorne Trademarks by reselling the products on the Internet, thereby committing an independent tort.

257.    Defendants were not justified in their conduct and acted with a wrongful purpose by acquiring Thorne products from Authorized Resellers for the purpose of resale in violation of the Thorne Rules and Thorne's agreements with its Authorized Resellers.

258.    Thorne's agreements with its Authorized Resellers are a specific class of contract that Defendants are causing Authorized Resellers to breach when they purchase products from Authorized Resellers for resale.  Although Thorne does not yet know which specific Authorized Reseller(s) have breached their agreements with Thorne—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Thorne's claim of tortious interference.

259.    Defendants are not parties to the contracts they caused Authorized Resellers to breach.

260.    Defendants' actions have caused injury to Thorne for which Thorne is entitled to compensatory damages in an amount to be proven at trial.

261.    The injury to Thorne is immediate and irreparable, as Thorne's reputation and relationships have been damaged among its consumers and Authorized Resellers.

262.    Thorne is also entitled to recover punitive damages because Defendants have acted with fraud, malice, and willful and wanton conduct.

### SIXTH CAUSE OF ACTION
**Breach of Contract Against Defendants Vasesource Purchasing, LLC, Ryan Shema, and Ronnie Goodman**

263.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

264.    Vasesource Purchasing, Ryan as the sole member of Vasesource Purchasing, and Goodman as the "Senior Purchaser" of Vasesource Purchasing who signed the Purchase Agreement (collectively, "Breaching Defendants"), entered into a valid and enforceable contract with Thorne.

265.    Thorne has performed all of its obligations under the contract.

266.    The Breaching Defendants have breached their contract with Thorne by marketing and selling Thorne products on third-party marketplaces, including the BH Prime Storefront on Amazon.

267.    The Breaching Defendants have not cured these breaches and continue to breach their contract with Thorne.

268.    The Breaching Defendants have no legal excuse for failing to perform their obligations under the contract.

269.    As a proximate result of the Breaching Defendants' breaches of the Purchase Agreement, Thorne has suffered damages, including loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Thorne prays for relief and judgment as follows:

A.    Judgment in favor of Thorne and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      That a permanent injunction be issued enjoining Defendants; their agents, servants, employees, and attorneys; and other persons who are in active concert or participation with them ("Enjoined Parties") as follows:

i)      Prohibiting the Enjoined Parties from distributing, circulating, selling, offering to sell, advertising, promoting, or displaying, via the Internet or otherwise, any Thorne Products or products bearing Thorne's Trademarks;

ii)     Prohibiting the Enjoined Parties from using Thorne's Trademarks in any manner, including advertising on the Internet;

iii)    Requiring the Enjoined Parties to take all actions needed to remove Thorne's Trademarks, and any reference to Thorne Products, from any website operated by or associated with the Enjoined Parties.  These required actions include, but are not limited to removing all Thorne Products and Thorne Trademarks from any online marketplace storefront operated by or associated with the Enjoined Parties, including, but not limited to, the Amazon storefront with Merchant ID AS3PH96JPNM1O and currently known as "BH Prime," and requesting removal of any website operated by or associated with the Enjoined Parties and containing Thorne Products or Thorne Trademarks from Internet search engines, including Amazon's product search and Google; and

iv)     Requiring the Enjoined Parties to destroy or return to Thorne all products bearing the Thorne Trademarks in their possession, custody, or control.

C.      An award of attorneys' fees, costs, and expenses; and

D.      Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Thorne demands a trial by jury on all issues so triable.


Date: November 3, 2023

/s/ Julie L. Moore

Julie L. Moore (Fed. Bar No. 11138)
Robert Wehrman (Fed. Bar No. 13426)
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, South Carolina 29401
Telephone: (843) 720-2044
Facsimile: (843) 720-2047
jmoore@duffyandyoung.com
rwehrman@duffyandyoung.com

*Attorneys for Plaintiff Thorne Research, Inc.*

Of counsel:

Martha Brewer Motley
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
Phone: (614) 464-6360
Fax: (614) 464-6360
mbmotley@vorys.com

Emma K. Morehart
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Cincinnati, OH 45202
Phone: (513) 723-4036
Fax: (513) 723-4036
ekmorehart@vorys.com

*Pro hac vice applications forthcoming*